# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 3116 | **DATE** | 5/6/2004 |
| **CASE TITLE** | YCA, LLC vs. Kevin J. Berry | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 27 May 04 at 9:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  ENTER MEMORANDUM OPINION AND ORDER: YCA's motion for summary judgment on Berry's counterclaim is granted. Berry's motion for summary judgment as to Counts I, III-VII is denied. Berry's motion for summary judgment as to Count II, for breach on agreement not to disclose non-confidential information is granted in part and denied in part. The court denies YCA's motion for default judgment, but sanctions Berry by awarding YCA attorney's fees and costs. Berry's motion to strike the testimony and expert report of Mandall is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | Document Number |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | MAY 0 7 2004 |
| | Notified counsel by telephone. | date docketed |
| ✓ | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |
| WAP | courtroom deputy's initials | date mailed notice |

U.S. DISTRICT COURT

2004 MAY -7 AM 7:55

Date/time received in central Clerk's Office

mailing deputy initials

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

MAY 6 2004

JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

YCA, LLC,

Plaintiff,

v.

KEVIN J. BERRY,

Defendant.

Case No. 03 C 3551

Hon. Harry D. Leinenweber

DOCKETED

MAY 7 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff YCA, LLC (hereinafter, "YCA") filed a seven-count complaint against one of its former employees, Defendant Kevin Berry (hereinafter, "Berry"). Counts I, II and III of YCA's complaint allege that Berry breached duties of non-solicitation, non-recruitment and non-disclosure he agreed to as part of a restrictive covenant he signed when he commenced work as a consultant for YCA. Counts IV and V allege that, primarily through this breach, Berry tortiously interfered with YCA's business and violated his duty of loyalty to YCA. Counts VI and VII request that the Court enjoin Berry from continuing his alleged conduct, and request that the Court award it attorneys' fees for the course of this action.

## I. BACKGROUND

YCA, and its predecessor, Young, Clark & Associates, Inc. (hereinafter, "Young Clark"), earn revenue by training its clients



how to use Microsoft's Project and Primavera software.  Primarily,
YCA "consults" by conducting training classes, in which YCA
instructors teach a client's employees how to use this software.
YCA also provides its clients with YCA-developed software utilities
specially designed to service that client's particular need.  Over
the years, YCA claims that it has developed unique consulting
processes, methods, and techniques called "skill blocks" which it
teaches its hired consultants.  YCA also has developed confidential
marketing skills and techniques to lure and retain clients.

In 1997, Young Clark retained Berry to serve as one of its
consultants.    Young    Clark    insisted    that    Berry    sign    a
"Confidentiality/Non-Disclosure/Restrictive Covenants Agreement" in
consideration of his work for YCA.  This agreement barred Berry
from disclosing any of YCA's confidential information while
associated with YCA, and for two years thereafter.  The agreement
stated that confidential information includes, but is not limited
to:

> .   .   .   project   management   training   and
> consulting   techniques,   project   management
> software   development   processes,   project
> management charts, tables, graphs and forms,
> computer programs and documentation, customer
> or supplier lists and information, pricing
> information, marketing and distribution plans,
> dealing   lists   and   financial   information
> concerning the business affairs of YCA.

The agreement also imposed two restrictive covenants on Berry,
which bar him from recruiting YCA employees and soliciting YCA

customers.  In its terms, the covenant of non-recruitment states
that during Berry's tenure with YCA and for two years thereafter,
he shall not:

> . . . directly or indirectly by assisting
> others, recruit or hire, or attempt to recruit
> or hire, any other associate of YCA, or induce
> or attempt to induce any associate of YCA to
> terminate association with YCA.

The covenant of non-solicitation contains narrower language,
barring Berry only from soliciting (within two years of ending his
employment):

> . . . any of YCA's customers, including
> actively sought prospective customers, with
> whom you have had material contact during your
> association for purposes of providing products
> or services that are competitive with YCA;
> [sic] Provided that "material contact is
> agreed to exist between you and each customer
> or potential customer: (i) with whom you have
> dealt; (ii) whose dealing with YCA were
> coordinated or supervised by you; or (iii)
> about whom YCA obtained confidential
> information in the ordinary course of business
> as a result of your association with YCA;
> [sic] Provided further that the geographic
> scope of this nonsolicitation of customers
> restrictive covenant shall be coextensive with
> those political subdivisions . . . where YCA
> does business."

During the course of his relationship with Young Clark/YCA,
Berry spent approximately 90% of his time working on projects for
Caterpillar Inc. (hereinafter, "CAT").  Out of roughly 200
worldwide CAT facilities, Berry worked for CAT Financial Services
(hereinafter, "FS"), CAT Lafayette Engine Center (hereinafter,
"LEC"), and the CAT More Electric Initiative (hereinafter, "MEI").

Berry also performed work for CB Richard Ellis and Alliance Energy Inc.

In November 1998, Young Clark sold itself to ProfitSource Corporation, and became a wholly-owned subsidiary of ProfitSource. The 1998 stock-purchase agreement specified that all employee restrictive covenants remained binding and enforceable. In 2000, Young Clark's former owner Alden P. Young formed YCA and purchased all of Young Clark's assets from ProfitSource. Section 1.1(b) of the Asset Purchase Agreement defined as an asset transferred from Young Clark to YCA "all of Young Clark & Associates, Inc.'s right, title and interest under its contracts, which for purposes hereof, shall mean all . . . restrictive covenants described in Section 3.10." However, § 3.10 on its face appears to release these covenants, stating that "Young Clark & Associates, Inc. [and Shareholder] hereby release and extinguish the restrictive covenants applicable to . . . all employees of Young Clark and Associates, Inc. who become employees of YCA, Inc." Berry contends that this Asset Purchase Agreement released all of the restrictive covenants binding him to Young Clark/YCA. YCA disagrees, noting that, in a related matter, a Georgia court has already held that the Asset Purchase Agreement merely extinguished *Young Clark*'s rights under the restrictive covenant, and transferred said rights as assets to YCA.

Sometime between October and December in 2002, Berry began discussing a plan to leave YCA and start a rival consulting firm with fellow employees Thomas Stevens ("Stevens") and William M. Wilson ("Wilson"). Between December 2 and December 9, 2002, Stevens and Wilson entrusted Berry with finalizing a 3-year cash flow projection and developing a competitive advantage statement, business plan, travel and expense form, billing forms, and local press releases. Berry used his YCA computer to create the travel and expense form, using a YCA form as a template. Berry also met with Stevens, Steven's wife, and Wilson on December 16 to strategically plan their new company. Berry also planned all-day meetings with them on December 21 and 22, although it is not certain that those meetings actually took place. During these conducted and planned meetings, Berry and his partners orchestrated everything from their new company's pricing strategy to its competitive advantages. The planned discussions also included identifying "high" and "medium" probability clients for their new company. On January 6, 2003, Stevens resigned from YCA. On January 7, Stevens formally created PMAlliance, a new company that would specialize in precisely the same business as YCA. On January 14 and January 30, respectively, Wilson and Berry announced their resignations, and subsequently joined PMAlliance.

At the same time Berry was meeting with Stevens and Wilson to plan PMAlliance, he served on the Marketing Team of YCA. This

- 5 -

team, which included just eight YCA officers, communicated via telephone and e-mail several times per month to formulate YCA's strategies for obtaining and retaining clients. Following Stevens' resignation on January 6, 2003, YCA asked Berry if he planned on joining Stevens at PMAlliance, so as to ascertain whether YCA should remove him from the Marketing Team. Berry informed YCA that he had no plans to leave YCA. This allowed Berry to remain on the team until he announced his own resignation on January 31, 2003. Between the time of Stevens' resignation and his own, Berry used his YCA telephone to call Wilson and Stevens, presumably to help plan PMAlliance.

In February 2003, shortly before his resignation from YCA became effective, Berry had dinner alone with YCA consultant Crissy Blanton ("Blanton"). Berry also had discussions with YCA consultant Bill Bordiuk ("Bordiuk") about designing computer software for PMAlliance. Bordiuk eventually left YCA to join PMAlliance.

Upon resigning from YCA, Berry became Executive Vice President of PMAlliance, where he assumed responsibility for PMAlliance's marketing efforts. Over the next few months, Berry phoned and/or e-mailed several CAT officials whom he met while working for YCA. For example, Berry called CAT FS officer Jack Sollner ("Sollner") twenty-nine times between February and June 2003. Over the course of these discussions with Sollner and others, Berry succeeded in

winning several consulting contracts with CAT for PMAlliance. Berry contends that he never solicited work from any of these individuals. Rather, Berry insists that the CAT officers solicited *him* for work. YCA disputes this assertion, a material fact that the Court relies on below in precluding summary judgment.

Additionally, Berry retained more than 1,000 pages of documents he accumulated while working for YCA, and brought these documents over to PMAlliance. Among other things, Berry kept 19 of YCA's Itemization of Client Services forms spanning nine months of YCA billings in 2002 containing client-sensitive price information and client-contact information, YCA expense information related to specific clients, and YCA client files, includes more than 1,000 pages of status memos, program files, report packages, meeting notes etc., regarding projects Berry had worked on during his employment with YCA. Berry acknowledges keeping these documents, but contends that they are contractually the property of CAT, not YCA.

## II. **DISCUSSION**

### A. **Possible Extinguishment of the Restrictive Covenants**

Berry argues that the Asset Purchase Agreement in 2000 extinguished all of his obligations under the restrictive covenants. Berry raises this argument both to support his summary judgment claim, and as the basis for his counterclaim that YCA breached its contractual obligations to him as an alleged third-

party beneficiary of the Asset Purchase Agreement. Since such a possible extinguishment would render moot the rest of the pending issues, the Court addresses it first.

Section 10.6 of the Asset Purchase Agreement ("Entire Agreement; No Third Party Beneficiaries") states that "except for any additional agreements contemplated hereby and referenced herein, this Agreement . . . is not intended to confer upon any person other than Seller and Purchaser, any rights or remedies hereunder." Berry contends that he qualifies as a third-party beneficiary under § 10.6's "except for" clause. Berry notes that §§ 3.10, 8.4, 9.2 and 9.3 of the Asset Purchase Agreement appear on their surface to denote certain benefits to "all employees of Seller who became employees of Purchaser," a class that includes him. Section 3.10 states that "Seller and Shareholder [Young Clark and Profitsource] hereby release and extinguish the restrictive covenants applicable to . . . all employees of Seller who become employees of Purchaser." Sections 9.2 and 9.3 release these restrictive covenants in the event that a bankruptcy or cancellation interrupts finalization of the Asset Purchase Agreement. Although no such bankruptcy or cancellation took place, Berry asks the Court to consider them as evidence of the contracting parties' intent. Lastly, § 8.4 states that all employees shall "enter into such agreements with Seller necessary

to terminate any and all prior employment agreements between such employees and Seller."

YCA disagrees that the Asset Purchase Agreement bestows any rights to Berry as a third-party beneficiary. YCA notes that § 1.1(b) of the Asset Purchase Agreement defines as an "asset" transferred to Purchaser YCA "rights of the Seller, Shareholder and EPS Solutions Corporation under the restrictive covenants described in Section 3.10." YCA thus argues that the true intent of § 3.10 is to release solely Young Clark's rights under the restrictive covenants, so as to avoid the "vulnerability of [the] assignee to competing claims." *E. Allan Farnsworth, Contracts*, § 11.9, pp. 817-823 (2d Ed. 1990). After all, YCA contends, it would be illogical for a contract to transfer a right to a purchaser, while simultaneously extinguishing that right.

In related litigation concerning Berry's business partner Stevens, a Georgia state court ruled that Stevens' restrictive covenants remained enforceable despite the Asset Purchase Agreement. The Georgia court noted:

> It would have made no sense for the parties to the Asset Purchase Agreement to define the restrictive covenants as 'assets' - or for YCA, LLC to purchase them - if YCA, LLC could not enforce them. Accordingly, when Sections 1.1(b) and 3.10 are read together, and each section is given meaning, it is clear that the parties intended for YCA, LLC to acquire Young, Clark & Associates, Inc.'s right in the restrictive covenants at issue, and for Young, Clark & Associates, Inc. to release it *[sic]* rights in the same.

*Thomas P. Stevens and PM Alliance v. YCA, LLC and Alden P. Young*, Case No. 03-A-00354-4 (Superior Court of Gwinnet County, Georgia 2003).

The Georgia court's decision does not control this Court's ruling here. Nevertheless, this Court finds its reasoning persuasive. This is particularly true in light of the general presumption under Illinois law that parties contract only for their own benefit. *Federal Ins. Co. v. Turner Const. Co.*, 660 N.E.2d 127, 132 (App. Ct. Ill. 1995). Therefore, the Court finds that § 3.10 grants Berry no third-party rights under the contract and that. Consequently, he remains bound to the restrictive covenants he signed, to the extent the Court can enforce those covenants under Illinois law.

Similarly, Berry's argument that he constitutes a third-party beneficiary under § 8.4's release of employment contracts does not hold water. As seen in §§ 1.1(b), 3.10, 9.2, and 9.3, the contract distinguishes between the terms "employment contract" and "restrictive covenants." Therefore, the contract's plain language indicates that § 8.4 does not release Berry from "Confidentiality/Non-Disclosure/Restrictive Covenants Agreement" he signed. Therefore, the Court grants YCA's motion for summary judgment as to Berry's counterclaims.

## B. Berry's Motion to Strike Testimony of Robert Mandall

Berry has moved to strike the testimony of YCA's computer expert Mandall, who recovered a plethora of deleted documents from Berry's old YCA computer. Berry contends that YCA failed to disclose Mandall by the required discovery cut-off deadline of December 23, 2003. Berry also argues that YCA deliberately withheld Mandall's name from its interrogatory and document production responses, which was filed after the close of discovery by agreement of the parties. Berry notes that, in YCA's January 13, 2003 responses to his interrogatories 1, 2, 5, and 6, YCA denied having anyone work on Berry's computer, and denied using any expert witnesses at all. Similarly, Berry points out that in YCA's January 23, 2003 responses to a document production request, YCA stated that while it would produce documents recovered from Berry's YCA computer, "to date, none exist." Berry believes that YCA's subsequent disclosure of Mandall in its response to Berry's summary judgment motion violates Rules 26(a)(2)(B) and 37(c)(1) of the Federal Rules of Civil Procedure. This prejudiced Berry, as Berry prepared his summary judgment motion without full knowledge of YCA's case against him. As a sanction, Berry asks the Court to strike Mandall's declaration, and the documents he recovered from the computer.

The Court need not address whether YCA violated discovery rules, as it finds that any such delay was justified. YCA

submitted the above discovery responses in light of Berry's deposition testimony during July and August 2003. In that testimony, Berry stated that he had no contact with Stevens regarding the formation of PMAlliance other than an e-mail exchange regarding a projected cash-flow statement. Berry stated that this exchange took place on either his AOL or Yahoo account. Therefore, based on Berry's sworn deposition testimony, YCA had no reason to suspect that Berry's YCA computer would contain discoverable information. Indeed, such a search would have amounted to an expensive fishing expedition for YCA, as YCA notes that Mandall charged YCA $5,000 to $10,000 per computer to find and recover deleted files.

This changed on February 11, 2004 when Berry augmented his prior testimony with a sworn affidavit. In this affidavit, Berry stated that, in addition to examining the cash flow chart, he "also printed a checklist or 'New Company Task List' from publicly-available Microsoft Project software and sent it to Stevens." In doing so, Berry acknowledged creating a document that theoretically *could* exist on his YCA computer, and not just on his outside e-mail accounts. This affidavit, by itself, justified YCA's late-found interest in Berry's computer, which culminated in Mandall's March 12, 2004 report.

Berry responds to YCA's argument in two ways. First, Berry notes that Stevens' January 12, 2004 deposition makes reference to

Berry working on a "document" (which Berry claims refers to the New Company Task List) using a Microsoft business template. This, Berry contends, should have put notice on YCA that Berry's YCA computer would contain discoverable information. Even if the Court agreed that this vague reference from Stevens' deposition placed YCA on notice regarding Berry's YCA computer, it hardly presented YCA with enough time to affect its responses to Berry's interrogatories (due the next day, January 13, 2003) or document production requests (due January 23, 2003). YCA's response to the document production requests – that it would disclose all documents recovered from Berry's computer, but that "to date, none exist," the Court considers an entirely honest and legitimate response to the very late, very vague "disclosure" in Stevens' deposition that Berry's YCA computer might contain discoverable information. In general though, looking at the vagueness of Stevens' January 2004 deposition testimony – contrasted with the clear denials found in Berry's July and August 2003 deposition testimony – the Court finds it impossible to say that Stevens' obscure, throw-away reference to Berry working on a "document" qualified as giving YCA legitimate notice. Further, to require YCA to give notice of Mandall's work shortly after receiving Stevens' testimony supposes that YCA could nearly instantly: read the tea-leaves of Stevens' deposition, derive that this testimony implies that important deleted documents might be found on Berry's YCA computer, conduct a cost-benefit

analysis to determine whether retrieving this mysterious "document" is worth Mandall's $5,000 to $10,000 fee, hire Mandall, and then give Berry notice of his hiring. The Court elects not to impose such a heavy burden on YCA.

Second, Berry argues that, even if Berry's February 11, 2004 affidavit constituted the first notice YCA received regarding Berry's computer, YCA should have informed Berry of Mandall's work prior to March 12, 2004. In particular, Berry claims that YCA's counsel misled him into thinking that Mandall would not work on his computer in a February 26, 2004 counsel-to-counsel letter. This letter stated that "YCA has hired and intends to use Robert Mandall regarding computers" and added that "[b]oth Wilson's and Steven's YCA computers are being examined by forensic analysis." Berry argues that by *not* including his computer as one "being examined," YCA intentionally misled him of its discovery intentions.

This argument is not persuasive. Berry's argument centers around the idea that he was prejudiced by YCA's late disclosure of Mandall's work. However, the Court detects no appreciable prejudice to Berry caused by the delay between February 26, 2004 and March 12, 2004. Berry filed his supposedly prejudiced summary judgment motion on February 13, 2004 – nearly two-weeks *before* the February 26, 2004 letter. Therefore, it is difficult to see how a theoretical YCA disclosure on February 26, 2004 instead of March 12, 2004 would have remotely impacted Berry's case or summary

judgment motion. The Court further notes that Berry raised the February 26, 2004 letter only in his reply brief, depriving YCA of an opportunity to possibly explain its omission of Berry's computer from those Mandall was analyzing. Therefore, given the harmless nature of YCA's two-week delay, and the overall promptness of YCA's notice (a month after learning that it contained discoverable information), the Court declines to sanction YCA by striking Mandall's testimony or findings.

Berry's posture with respect to Mandall's testimony brings to mind the tale of the criminal who murders his parents and then begs the Court's mercy because he is an orphan. Having stalled, evaded and danced around its statutory obligations to provide YCA with notice on where it might find discoverable information, Berry now seeks to exclude this newly-discovered evidence. If Berry had wished to avoid "unfair surprise" concerning his legal strategy (not concerning the information, since *he* was its author), perhaps he should have followed the spirit of the discovery rules and informed YCA back in July and August 2003 that his YCA computer might contain relevant documents. The Court does not believe that the mere month's time between Berry's affidavit it took YCA to file amended discovery answers was excessive. Accordingly, the Court denies Berry's motion to strike Mandall's affidavit.

## C. YCA's Motion for Default Judgment

YCA contends that the documents recovered by Mandall prove that Berry perjured himself in his July and August 2003 deposition testimony. YCA claims that Berry perjured himself in the following ways:

1) By specifically denying that he and Stevens had discussed the formation of PMAlliance through e-mail, phone conversations or in-person meetings, other than with respect to a single e-mail containing a three-year projected cash flow plan;

2) By specifically denying that he was involved in the development of PMAlliance's business plan, or in identifying high or medium probability clients; and

3) By specifically denying that he and Wilson had ever discussed plans to leave YCA and join Stevens' new company, or that he knew that Wilson had drafted a PMAlliance mission statement.

To prove perjury, YCA must meet a high burden. The Supreme Court has held that a witness does not commit perjury unless "[he] gives false testimony concerning a matter with the willful intent to provide false testimony, rather than as result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). However, should YCA succeed in proving perjury, the Court has the inherent authority to sanction the opposing party for its misconduct. This inherent authority derives "not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and

expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501
U.S. 32, 42 (1991). Sanctions such as shifting attorneys' fees and
default judgment may be imposed under the court's inherent
authority. *Id.* at 44-45.

With respect to claims 2 and 3, the Court believes that Berry
merely evaded the full-truth citing a remarkably faulty memory,
rather than committing actual perjury. Specifically, Berry states
that he "wasn't really" involved in formulating PMAlliance's
business plan or a high and medium probability client list.
Similarly, Berry remarked that he "didn't know" whether or not he
had talked with Wilson about joining Stevens' new company, and was
"not familiar" with whether Wilson drafted a PMAlliance mission
statement. Such semantic or memory distinctions do meet the legal
definition of perjury.

Conversely, Berry's statements regarding his contact with
Stevens constitute deliberate untruths. In particular, the
following deposition exchange proves damaging:

> **Q:** [d]id anything happen after that cash-flow
> analysis that conveyed to you the impression
> that Mr.   Stevens was still serious about
> starting his own company?  Did he have any
> conversations with you, send you E-mails,
> anything like that?
> **Berry:** No.
>
> **Q:** So when did you next know that, in fact, Mr.
> Stevens was implementing this plan?
> **Berry:** When he sent everyone an E-mail
> announcing his resignation.

In reality, documents recovered from Berry's computer showed that he had extensive meetings with Stevens about forming a new company subsequent receiving the cash-flow statement. Specifically, Berry's YCA computer shows the cash flow plan first appearing on December 2, 2002. This same YCA computer shows meeting notes for a December 16, 2002 meeting with Stevens, Stevens' wife, and Wilson. It also shows meeting plans for all-day meetings to take place December 21-22, 2002. Berry's YCA phone records similarly show numerous calls to Stevens during December 2002, after he received the cash-flow plan but prior to Stevens' January 2003 resignation. Berry himself admitted, in his February 11, 2004 affidavit, that in addition to looking at the cash-flow analysis, he also participated in creating a "New Company Task List." This evidence is not remotely consistent with Berry's sworn statement he had no conversations, e-mails, or "anything like that" with Stevens between the time he received the cash-flow statement and the time Stevens resigned.

However, the Court does not believe this perjury entitles YCA to a default judgment. Berry himself corrected some of the damage caused by his false testimony by submitting his February 11, 2004 affidavit. This affidavit alerted YCA to the need to conduct a last minute examination of Berry's computer, allowing it to find the documents and information covered up by the perjured deposition testimony. Indeed, ironically, Berry's false testimony has, in

many ways, only hurt himself as it prevented YCA from discovering and disclosing to Berry the documents on his YCA computer. This, in turn, led to Berry filing a summary judgment motion based on an incomplete case record. Therefore, it is hard to find that YCA suffered any prejudice from Berry's perjury, and may have actually benefitted from it.

Nevertheless, the Court feels a sanction is appropriate. Berry offered his February 11, 2004 affidavit only after Stevens' January 2004 deposition testimony suggested (albeit vaguely) that Berry's July and August 2003 deposition testimony contained inaccuracies. Had Stevens' testimony not *potentially* alerted YCA to Berry's false testimony, it's possible that Berry would have chosen not to submit his February 11, 2004 affidavit. This, accordingly, might have allowed him to succeed in concealing the depth of his involvement in the formation of PMAlliance indefinitely - or at least past the course of this litigation. Therefore, as punishment for his misleading and dishonest testimony, the Court imposes the lesser sanction of awarding YCA all of its attorney's fees and costs associated with the taking of Berry's depositions, responding to Berry's summary judgment motion, preparing its own summary judgment motion on the cross-claims, preparing its own default judgment motion, and retaining Mandall's services to recover deleted documents on Berry's YCA computer.

## D. Count I: Breach of Contractual Non-Solicitation Provision

Illinois law disfavors restrictive covenants as a restraint on trade. As such, courts must strictly construe them to ensure that their intended effect is not to prevent competition *per se*. *Hanchett Paper Co. v. Melchiorre*, 792 N.E.2d 395, 400 (Ill. App. Ct. 2003). Courts should enforce restrictive covenants only upon finding the covenant reasonable and necessary to protect an employer's legitimate business interest. *Id.* Illinois law recognizes two legitimate business interests: (1) near-permanent customer relationships in which the employee would not have had contact with the customer absent the employee's employment; and (2) confidential information gained by the employee through his employment that he could use for his own benefit. *Id.*

Berry does not dispute that YCA had a legitimate business interest, *per se*, in protecting him from soliciting customers. Rather, Berry seeks summary judgment on two grounds: (1)that the non-solicitation covenant is unreasonably broad and unenforceable as a matter of law; and (2) that YCA has produced no evidence that he solicited anyone.

Berry contends that the non-solicitation covenant is unreasonably broad because it lacks any geographic scope. Berry argues that since CAT has 277 facilities located in 43 countries, while he only worked with five facilities located within the United States, the restrictive covenant is "inherently unreasonable."

Berry is correct that Illinois law generally disfavors non-solicitation covenants without a geographic scope, and the authority he cites adequately supports this proposition. However, in each of the cases he cites, the restrictive covenant at issue was much broader than the one Berry signed. Notably, in every case the covenant at issue did not limit its applicability to *only* those customers with whom the employee had material contact. *See Pactiv Corp. v. Menasha Corp.* 261 F.Supp. 2d 1009, 1014-1015 (N.D. Ill. 2003)(ban on hiring any of company's worldwide management-level employees unreasonably broad); *Telxon Corp. v. Hoffman*, 720 F. Supp. 657, 664 (N.D. Ill. 1989)(no provision limited scope of covenant not to compete to customers with whom employee had developed relationships); *Ken-Pin, Inc. v. Vantage Bowling Corp.*, 2004 U.S. Dist., LEXIS 1050, at *20 (N.D. Ill. 2004)(again, no limitation of restrictive covenant to customers with whom employee had worked with). Conversely, when the restrictive covenant contains no geographical limitation but limits its effect to customers with whom the employee had material contact with, as in Berry's case, Illinois courts have repeatedly upheld such restrictive covenants valid. *See Tower Oil & Technology Co. v. Buckley*, 425 N.E.2d 1060, 1066 (Ill. App. Ct. 1981); *Health Professionals, Ltd. v. Johnson,* 791 N.E.2d 1179, 1192 (Ill. App. Ct. 2003)(internal citation omitted). Therefore, the Court finds

the restrictive covenant of non-solicitation enforceable against Berry.

The Court now turns to Berry's second summary judgment argument concerning the covenant of non-solicitation: that YCA has produced no evidence that *he* solicited CAT, and not that CAT solicited him. Berry concedes that YCA has produced substantial evidence showing that he called Sollner 29 times, that he called CAT official Fred Martin twice, that he e-mailed CAT LEC officer Steve Shoemaker to "discuss PMAlliance manpower to support his three projects," and that he informed CAT official Kent Bates that he was leaving YCA to join PMAlliance. However, Berry notes that none of this evidence is inconsistent with a finding that these CAT officials solicited him for work, and that his restrictive covenant does not prevent unsolicited work from former YCA clients with whom he had material contact. Further, Berry states that the only evidence in the record of whom solicited who comes from his own deposition testimony, in which he states that these officials contacted him first.

Berry asks the Court to distinguish between solicitation and contact, citing *Henry v. O'Keefe*, 2002 WL 31324049, at *5 (N.D. Ill. 2002) for the proposition that Illinois courts recognize such a distinction. However, *O'Keefe* actually demonstrates how broadly Illinois law defines "solicitation." In *O'Keefe*, a former co-owner of a consulting firm, Jean O'Keefe ("O'Keefe"), contacted several

clients whom she had covenants not to solicit for another year. In these contacts, O'Keefe stipulated that she could not work for the clients for another year due to the restrictive covenant, but asked the clients to "let [her] know when you come upon a company looking for help from someone like [her]." *Id.* Despite the fact that O'Keefe specified that she *could not do any work* for these clients, the Court found that she had breached her non-solicitation covenant. *Id.* at *6.

Next, Berry attempts to draw an analogy to criminal law, arguing that just as phone records cannot prove criminal conspiracy, neither can they evidence civil solicitation. Although Berry properly describes the criminal law rules, the Court believes the analogy is inappropriate. Criminal law is replete with evidentiary rules which place a far heavier burden on the prosecution than the corresponding civil rule would on a plaintiff, such as the famous "beyond a reasonable doubt" standard of proof.

Rather, in considering the sufficiency of the phone and e-mail records to meet YCA's summary judgment burden, the Court instead looks to Illinois lenient rules regarding what constitutes solicitation. As the Court in *O'Keefe* notes, "the law generally deems a person to have intended the natural and probable consequences of [his] actions. Thus, if a recipient would have understood a particular contact as a solicitation for business, that suffices to show solicitation." *Id.* at *5. Indeed, under

Illinois law, an employee violates a non-solicitation covenant even if he contacts clients merely to inform them he has changed employers, as the clients might understand that as a request to move with him to the new company. *Merrill Lynch, Pierce, Fenner & Smith v. Cross,* 1998 U.S. Dist., LEXIS 3188 at *4.

Here, on at least one occasion, Berry informed a former client that he was leaving YCA to form PMAlliance. Further, Berry's repeated contacts with multiple CAT officials, when combined with evidence showing that PMAlliance had prepared a list of "high" and "medium" probability client possibilities, clearly meets YCA's burden of showing the "specific issues of material fact" in dispute necessary to withstand summary judgment. Although Berry claims that he was solicited, and not the other way around, he is correct when he elsewhere reminds the Court in his briefs that it should reject any "attempt to inject Berry's credibility into summary judgment." Rather, the truthfulness of Berry's claims regarding whom solicited who is a jury question. Therefore, the Court denies summary judgment as to Count I.

### E. Count II: Breach of Non-Disclosure Agreement

Berry also seeks summary judgment on YCA's claims regarding his breach of a non-disclosure agreement. Berry seeks summary judgment on three grounds: (1) the alleged information disclosed is not "confidential"; (2) any possibly confidential information

belongs to the customer, not YCA; and (3) YCA lacks evidence that Berry used confidential information.

Because each of these points contains enough legal validity to grant summary judgment as to *some*, but not all, the alleged confidential information, the Court believes it is useful to list all the types of confidential information that YCA claims Berry took with him to PMAlliance:

1) YCA billing information related to specific clients. This includes client-specific pricing, client-contact information, and expense information related to specific clients.

2) YCA's customer list, containing specific contact information.

3) YCA client files regarding projects Berry worked on during his employment with YCA.

4) YCA's marketing materials, including YCA marketing plans that Berry learned of while serving as a member of the Marketing Team.

5) YCA consulting techniques and confidential consulting processes, known as "skill blocks," which Berry learned as a consultant for YCA.

6) YCA's training materials.

Berry argues that much of the information he took from YCA to PMAlliance does not fit the legal definition of confidential information. Berry notes that his non-disclosure agreement defines confidential information to exclude "data or information that has become available to the public through no breach of this Agreement by you." This, Berry contends, includes information distributed to

customers or the public, such as the training material given to attendees of its classes, and the pricing information, marketing material, and list of 75 clients found either on YCA's website or given to prospective clients. Furthermore, Berry contends that the consulting techniques he learned at YCA now form part of his general knowledge, and do not qualify as "confidential information."

Concerning the information YCA provides paying or prospective customers, both YCA and Berry cite to *ILG Indus., Inc. v. Scott*, 49 Ill. 2d. 88 (1971) to support their argument. *Scott* held that "the disclosure of this information, or a part thereof, to a customer, or a supplier of a component part, where necessary for a business purpose, does not in all cases destroy the confidential or secret nature thereof." *Id.* at 94. In *Scott*, the Court found that the information remained confidential because "there was evidence that not all of the critical information was supplied. There was also evidence that the recipients thereof understood that the information they received was to be treated in confidence." Neither party refers to any cases that cite *Scott* on this point of law, and the Court's research has found none. Nevertheless, *Scott* apparently remains good law in Illinois, and its language binds the Court's decision here.

Looking at the *Scott* factors, it appears that YCA's training and marketing materials cannot constitute confidential information.

YCA acknowledges distributing its training materials to every attendee of its training classes, and its marketing materials to every potential customer. By definition, the training and marketing materials disclosed all of the information they contained distinguishing this case from *Scott*, in which "there was evidence that not all the critical information was supplied."

YCA notes that PMAlliance's training materials contain hidden computer "meta-tags" indicating they were prepared using a YCA template. This meta-tag template is not transparently disclosed to attendees of the training seminars. However, while meta-tags and templates might constitute "information," *Scott's* analysis concerned whether "not all of the *critical* information was supplied" (emphasis added). *Id.* With respect to the training materials, the Court believes that the *critical* information contained in YCA's training materials is that which would interest an attendee at one of their seminars. The Court highly doubts that these attendees have much use for meta-tags or hidden templates that contain no useful content and provide them no help in their training processes.

YCA also notes that these materials are copyrighted and trademarked, and claims that PMAlliance's materials are substantially similar to their own. However, YCA has not filed a breach of trademark or copyright claim, but only a claim for disclosure of confidential information. YCA cannot convert its

claim into one of breach of trademark or copyright merely by alleging substantial similarity to materials produced by PMAlliance.

Therefore, the Court agrees with Berry that all information which YCA distributes via its training seminars, non-client specific marketing materials or website cannot constitute confidential information. The Court thus grants summary judgment as to any of YCA's claims arising out of disclosure of that information. This does not include any pricing or marketing information which YCA devised *specifically* for one client. Similarly, it does not include any marketing information that Berry might have learned as a member of the Marketing Team that YCA did not widely disperse to its paying or potential clients. Unless excluded by the Court's ruling below, these claims survive for trial.

It also, technically, does not include customer lists and customer contact lists not available to the general public. However, in Illinois, customer lists qualify as protectable trade secret only when:

> . . . the information has been developed by the employer over a number of years at great expense and kept under tight security. However, the same type of information is not protectable where it has not been treated as confidential and secret by the employer, was generally available to other employees and known by persons in the trade, could be easily duplicated by reference to telephone directories or industry publications, and

> where the customers on such lists did business
> with more than one company or otherwise
> changed businesses frequently so that their
> identities were known to the employer's
> competitors.

*Office Mates 5, North Shore, Inc. v. Hazen*, 599 N.E.2d 1072, 1085
(Ill. App. Ct. 1992).

As both Berry and YCA note, this is a case for disclosure of
confidential information, not trade secrets. Illinois courts grant
substantially more protection to trade secrets than they do to
confidential information. Therefore, it is safe to assume, *a
fortiori*, that if Illinois law limits trade secret protection in
the above manner, it would restrict protection of confidential
information at least as severely.

Here, YCA disclosed a *partial* customer list to the public over
the internet and in its training materials, but did not disclose
every customer, nor the personal contacts it had with each
customer. With respect to the customers contained on the partial
list YCA provides to the public, the Court believes Berry has met
his initial summary judgment burden. This shifts the burden to YCA
to demonstrate specific triable issues of fact. YCA fails do so.
Therefore, the Court grants summary judgement as to claims
regarding the publicly disclosed customer list.

However, the Court declines to grant summary judgement as to
the names of contact individuals on the publicly disclosed lists,
or as to any customers not found on the publicly disclosed lists.

In summary judgment, Berry must first demonstrate the absence of any material fact before the burden shifts to YCA. Under *Hazen*, this would require Berry to show that the information contained in the non-disclosed contact and customer list was public information, or could "be easily duplicated by reference to telephone directories or industry publications." *Id.* Since Berry fails to present any evidence of this, Berry cannot obtain summary judgment on these claims.

Berry likewise argues that the "skill blocks" he learned as a YCA consultant now form part of his general knowledge, and do not qualify as protected confidential information. Illinois law highly disfavors protecting such knowledge from competition. As stated in *Scott*, "the right of an individual to follow and pursue the particular occupation for which he is best trained is a most fundamental right. . . . One who has worked in a particular field cannot be compelled to erase from his mind all of the general skills, knowledge and expertise acquired through his experience." *Scott*, 49 Ill.2d. at 93-94.

Asking the Court to depart from this general rule, YCA cites the Seventh Circuit case of *Curtis 1000 v. Suess*, 24 F.3d 941, 948 (7th Cir. 1994). There, the Seventh Circuit recognized that "Illinois cases distinguish between sellers of services . . . and sellers of ordinary goods." *Id.* The Court continued by noting that, with respect to sellers of services, "customers come to

repose trust in a particular seller, and that trust is a valuable business asset, created by years of careful management, that the employee is not allowed to take with him." *Id.* *Suess*, as can be seen from its clear language, is not legally or factually relevant to the present action. In *Suess*, an employee began competing against his former employer, in violation of a restrictive covenant. The "trust," or goodwill, protected by the Seventh Circuit concerned the employee's knowledge about "the particular needs and circumstances of the firm's customers in his sales area. The acquisition of this information enabled Suess to become an effective salesman for Curtis and he was compensated for his sales successes in the commissions he received generated by an employee on behalf of the employer." *Id.* at 947.

Here, however, YCA attempts to use *Suess* not only to prevent Berry from cashing in on the knowledge he acquired about YCA clients, but also to prevent Berry from using the non-client specific "skill blocks" of consulting knowledge he acquired in the employ of YCA. However, as shown above, *Suess* recognized a protectable property interest only in the "trust" earned by the employee, not in the knowledge of general business practices acquired through training and experiences. *Id.* at 948. As YCA cites no other cases to support this claim, the Court has nothing to consider but the general rule that "one who has worked in a particular field cannot be compelled to erase from his mind all of

the general skills, knowledge and expertise acquired through his experience." *Scott*, 49 Ill.2d. at 93-94. Consequently, the Court grants Berry's motion for summary judgment on all of YCA's claims concerning disclosure of its consulting techniques or "skill blocks."

Berry's second argument for summary judgment on Count II also makes a legally valid point. Under the terms of the Master Consulting Agreement between YCA and CAT, any confidential information created by a consultant "is and shall be owned by Caterpillar." The Agreement defines confidential information as:

> . . . any design, specification, idea, concept, plan, copy, formula, drawling, procedure, business process, organizational data, customer or supplier lists, or other business or technical information that the disclosing party holds confidential or considers proprietary whether oral, written or viewed by inspection, that is obtained as a result of services rendered by Consultant to Caterpillar in connection with this Agreement.

YCA's claims for disclosure of confidential information include claims that Berry revealed "client-specific pricing information," "YCA expense information related to specific clients," and "YCA client files." Much, if not all, of this information related to Berry's or YCA's work with CAT. To the extent that such information was information generated for the benefit of CAT, and presented to CAT (*i.e.,* project files, pricing data, etc.), the Court reads the terms of the Master Consulting Agreement as awarding CAT ownership of the information. YCA argues

that ownership of the information is irrelevant, as Berry did not obtain CAT's written permission to use the information. However, YCA has no standing to sue on CAT's behalf. Similarly, as this information belongs to CAT and not YCA, YCA has no cognizable interest authorizing it to sue Berry for disclosing this information. Note, as stated above, the Court's order concerning this information applies only to information generated by YCA for the benefit of CAT and handed over to CAT. Information concerning CAT generated by YCA for its own internal purposes (*i.e.*, marketing strategies on retaining CAT as a client), and information generated on behalf of other clients besides CAT, remains confidential information owned by YCA, in which YCA retains every right to sue Berry.

Berry's last argument that YCA has no evidence that he disclosed confidential information, mostly concerns claims for which the Court has already granted summary judgment. With respect to the non-disclosure claims that remain alive (client-specific marketing/pricing information given to clients other than CAT, confidential marketing information for YCA's own benefit and not given to clients, confidential marketing information that Berry learned as a member of the Marketing Team, and project files related to clients other than CAT), Berry merely claims that YCA has produced no evidence that he actually used this information on behalf of PMAlliance.

YCA tacitly acknowledges that it has no direct evidence that Berry used its confidential information. In responding to Berry's motion for summary judgment, YCA supported its claims solely by referring to its own complaint, and the speed with which Berry retained CAT as a client for PMAlliance. These "facts" are insufficient to withstand summary judgment.

However, YCA makes a legitimate legal argument that, as head of PMAlliance's marketing department, Berry has already or will inevitably disclose confidential information he learned in the employ of YCA. In *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269-1270 (7th Cir. 1995), the Seventh Circuit held that Illinois law recognizes the doctrine of "inevitable disclosure" in trade secrets cases. Although *PepsiCo* involved misappropriation of trade secrets, not mere confidential information, its factual record heavily informs the present action. In *PepsiCo*, a former marketing employee of PepsiCo went to work in marketing for PepsiCo competitor Quaker Oats. Although the employee pledged not to reveal any trade secrets he learned at PepsiCo, the Seventh Circuit recognized that inherent difficulty in him maintaining that pledge. The Court noted that:

> . . . unfairly armed with knowledge of PCNA's plans, [the employee Redmond] will be able to anticipate its distribution, packaging, pricing, and marketing moves. Redmond and Quaker even concede that Redmond might be faced with a decision that could be influenced

> by certain confidential information that he
> obtained while at PepsiCo."

*Id.* at 1270.

Ergo, "unless Redmond possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions about Gatorade and Snapple by relying on his knowledge of PCNA trade secrets." *Id.* at 1269.

The Seventh Circuit's decision in *PepsiCo* has been followed by at least one Illinois state court, and never disagreed with, suggesting that the Seventh Circuit's decision accurately reflected Illinois law. *See Strata Mktg. v. Murphy*, 740 N.E.2d 1166, 1177-1178 (Ill. App. Ct. 2000)("we believe *PepsiCo* correctly interprets Illinois law"). Numerous cases in this court have also followed *PepsiCo*, generally in marketing-relating cases such as this one. *See Lucini Italia Co. v. Grappolini*, 2003 LEXIS U.S. Dist., LEXIS 7134 at *53 (N.D. Ill. 2003); *Kempner Mobile Elecs. v. Southwestern Bell Mobile Sys.*, 2003 U.S. Dist., LEXIS 3512 at *68-69 (N.D. Ill. 2003).

Here, like in *PepsiCo*, the employee (Berry) held a sensitive marketing-related position. As a trusted independent contractor and member of the Marketing Team, Berry had access to highly sensitive confidential information regarding YCA's strategies and practices concerning specific clients and potential clients. Berry then moved to PMAlliance, where he performed the same marketing

duties he did for YCA, and where he soon signed consulting agreements with many former YCA customers. Regardless of whom first solicited who (a jury question to decide), the fact that Berry even negotiated to consult with these former clients certainly presents the logical inference that *he could not avoid* using YCA's confidential marketing information to his advantage. Indeed, similar to Berry argument with respect to the consulting knowledge he learned at YCA, and in accord with *PepsiCo*, this sensitive marketing data (which Berry accumulated both through his regular YCA work, and his membership on the Marketing Team) has now become part of Berry's general knowledge which the Court cannot expect him simply to forget. The fact that he (apparently) took some confidential marketing-related documents only makes a judicial inference of inevitable disclosure sufficient to withstand summary judgment more likely - as it suggests an actual intention by Berry to take efforts to remind himself of information he might accidently forget.

The Court draws the same inference with respect to the client project files Berry took which do not belong to CAT. Although Berry contends he retained these files only for legitimate reasons, the Court cannot grant him summary judgment based on his word alone when faced with likelihood that this information could lead to inevitable disclosure. Specifically, the Court declines summary judgment as to these files because they provided Berry with client-

sensitive information that, by definition, would aid or assist him in soliciting these clients or performing work on behalf of them.

## F. Count III: Breach of Contractual Duty of Non-recruitment

Berry also brings summary judgment with respect to YCA's claims that he breached a covenant not to recruit. Berry predicates this argument on two claims: (1) YCA lacks evidence that Berry recruited any YCA employee; and (2) Berry's covenant not to recruit is unenforceable.

Berry argues that YCA lacks evidence that he recruited anyone by noting that Stevens and Wilson resigned *before* him. Berry insists that he merely told Stevens he *might* have interest in joining him. This, Berry argues, is insufficient to show that Berry participated in recruiting Stevens or Wilson.

YCA disagrees with Berry's assertions, noting that it has substantial evidence that Berry worked with Stevens and Wilson in setting up PMAlliance. This, YCA argues (and Berry fails to legally dispute), amounted to Berry inducing Stevens and Wilson to leave YCA by supporting them in their efforts to found PMAlliance. YCA supports this claim with a mountain of evidence obtained through expert witness Mandall's work in recovering files that Berry had deleted from his YCA computer. According to these files, Berry met or planned to meet at least three times with Wilson and Stevens during December 2002, and the three of them worked extensively in making preparations for the founding of PMAlliance.

YCA also has provided evidence that Berry solicited YCA employee Blanton, in the form of a declaration by Blanton. Although Blanton remains an employee of YCA, Berry has submitted nothing indicating that she has a personal interest in this dispute or that she perjured herself in her declaration. Consequently, the standard legal caution against relying on self-interested affidavits to withstand summary judgment does not apply to Blanton's declaration. Finally, YCA has also provided substantial evidence of Berry's successful efforts to recruit Bordick to design computer software for PMAlliance. Accordingly, the Court finds that YCA has provided sufficient evidence of Berry's efforts to recruit Stevens, Wilson, Blanton and Bordick.

Berry's second argument concerning his covenant not to recruit deserves more careful attention. Berry argues that, pursuant to *Unisource Worldwide, Inc. v. Carrara*, 244 F.Supp. 2d 977, 983 (C.D. Ill. 2003), non-recruitment covenants constitute an invalid restraint on trade in Illinois. *Carrara* noted that "the only two 'legitimate business interests' that may give rise to a covenant not to compete in Illinois are 'near permanent' relationships with customers, and confidential information or trade secrets." *Id.* Believing that a covenant not to recruit met neither interest, *Carrara* struck one down as unenforceable. In doing so, *Carrara* acknowledged that its opinion concerning Illinois law directly contradicted that of the Illinois Appellate Court in *Arpac Corp. v.*

*Murray*, 589 N.E.2d 640, 650 (Ill. App. Ct. 1992). However, the Court stated that it "is not bound by the Illinois appellate court's decision in *Arpac Corp.*, and believes that the Illinois Supreme Court, if and when it decides this issue, will support this Court's position." *Id.*

In *Pactiv Corp. v. Menasha Corp.*, 261 F.Supp. 2d 1009, 1014-1015 (N.D. Ill. 2003), a court in the Northern District of Illinois rejected as overly broad a covenant between employers that prevented one employer, Menasha, from hiring away any management-level employee of Pactiv. Generally under Illinois law, such contracts are valid, but cannot constitute an invalid restraint on trade between the two employers. *Freund v. E.D. & F. Man. Int'l, Inc.*, 199 F.3d 382,385 (7th Cir. 1999). In *Menasha*, the Court found such a restraint to exist. The Court noted that although the Pactiv had a protectable interest in not having Menasha hire away *some* of its management-level employees (specifically those which worked on an agreement between Pactiv and Menasha), the contract as written was overly broad by including *all* management-level employees. This, by definition, meant that the contract prevented Menasha from hiring away many of Pactiv's employees who possessed no confidential information.

Although not strictly factually analogous (as it concerned an employer-employer contract, not an employee restrictive covenant), the Court finds *Pactiv* highly instructive in adjudicating the

current issue - as well as in harmonizing *Carrara* with *Arpac*. As even *Carrara* acknowledged, Illinois law recognizes the protection of confidential information as a "legitimate business interest." Therefore, given *Arpac*, this Court holds that Illinois law declares a covenant not to recruit enforceable, to the extent that it supports the employer's legitimate business interest in guarding his confidential information from potential competitors.

The Court now turns to the question of whether *this specific restrictive covenant* limits itself to protecting that interest and, if not, whether the Court can reform the contract to do so.

As noted in the finding of facts, the restrictive covenants agreement states that Berry cannot:

> . . . directly or indirectly by assisting others, recruit or hire, or attempt to recruit or hire, any other associate of YCA, or induce or attempt to induce any associate of YCA to terminate association with YCA.

The Court finds such language far too over-broad to protect YCA's legitimate business interest: ensuring that its confidential information remains within YCA, and does not benefit competitors. Such a purpose could be wholly fulfilled by a restrictive covenant that places two important limitations on the scope of the non-recruitment provision. Specifically, such a covenant would bar Berry from recruiting only when (1) he recruits YCA associates who might possess any confidential information; and (2) he recruits these associates on behalf of a YCA competitor. However, the

covenant as written does not confine itself to those terms. Instead, it bars Berry from recruiting *any* YCA employees for *any* business, even for businesses doing wholly different lines of work, in geographic areas where YCA does not even function. The Court cannot understand what legitimate business purpose is accomplished by so broad a restrictive covenant. Indeed, to demonstrate the absurdity of this covenant, the Court notes that it would theoretically prevent Berry from recruiting a YCA's janitor to work as postal carrier in Somalia.

Illinois law abhors restraints on trade. *Center for Sight of Cent. Ill. I v. Deranian*, 712 N.E.2d 417,421 (App. Ct. Ill. 1999). As such, restrictive covenants must be strictly construed. *Hanchett Paper Co. v. Melchiorre,* 792 N.E.2d 395, 400 (App. Ct. Ill. 2003). Illinois courts will enforce restrictive covenants in the employment setting only if "the terms of the agreement are reasonable and necessary to protect a legitimate business interest of the employer." *Dam, Snell & Taveirne, Ltd. v. Verchota*, 754 N.E.2d 464, 468 (App. Ct. Ill. 2001). Here, the agreement contains unnecessarily broad terms, that serve to restrain trade beyond that required to protect YCA. Accordingly, Illinois bars enforcement of the contract as written.

However, although Berry's restrictive covenant is unreasonable on its face, it is not unreasonable as applied to Berry's conduct. The Court notes that the contract contains a "Construction of

Agreement" clause, which states: "[i]n the event a court should determine not to enforce a covenant as written due to overbreadth, you specifically agree that said covenant shall be enforced to the extent reasonable, whether said revisions be in time, territory, or scope of prohibited activities." This clause both empowers and requires the Court to attempt reform of Berry's overly broad covenant of non-recruitment. Such an effort is quite easy to accomplish. The Court hereby reforms Berry's restrictive covenant of non-recruitment to limit its applicability to cases in which Berry attempts to recruit those YCA associates who potentially possess confidential information to go work for a YCA competitor.

This reformed covenant, as applied, serves to protect YCA's legitimate business interests by keeping confidential information away from the prying eyes of competitors. The Court notes that each of the individuals recruited by Berry likely had access to such information, which they could use to benefit PMAlliance. Berry's restrictive covenant thus served YCA's legitimate interests in preventing competitior PMAlliance from learning that information. Therefore, the Court finds the reformed restrictive covenant enforceable, and denies summary judgment on this claim.

### G. Counts IV, V, VI, and VII

For the reasons stated elsewhere in this opinion, the Court denies Berry's motion summary judgment on these claims. YCA may continue to trial under these counts only with respect to claims

for which the Court did not summary judgment, with one caveat. Elsewhere in this opinion, the Court rejected YCA's disclosure of confidential information claims regarding YCA's training materials. The Court noted that the training materials publicly disclosed all critical information contained therein, although they contained hidden YCA meta-tags and template markers. However, although the Court grants summary judgment as to the non-disclosure claim concerning these training materials, it permits these claims to survive under Count V's theory that Berry breached his duty of loyalty to YCA. The Court notes that although the meta-tag and template data is hidden (and thus irrelevant to the average user), this data evidences that Berry created PMAlliance's training materials using a YCA-owned computer and/or YCA-owned software. Such a claim, if proven at trial, clearly shows that Berry committed what YCA alleged in paragraph 43(a) of its complaint.

### III. **CONCLUSION**

For the reasons stated herein the Court hereby:

1. Grants YCA's motion for Summary Judgment on Berry's counterclaims.

2. Denies Berry's Motion for Summary Judgment as to Counts I, III-VII.

3. Grants in Part and Denies in Part Berry's Motion for Summary judgment as to Count II, for breach on agreement not to disclose non-confidential information. Specifically, the Court

denies summary judgment as to the following confidential information: client-specific marketing/pricing information given to clients other than CAT, confidential marketing information for YCA's own benefit and not given to clients, confidential marketing information that Berry learned as a member of the Marketing Team, and project files related to clients other than CAT. The Court grants Berry's motion for summary judgment on Count II with respect to the rest of YCA's claims for disclosure of confidential information.

4. Denies YCA's Motion for Default Judgment, but sanctions Berry by awarding YCA attorney's fees and costs related to taking Berry's depositions, responding to Berry's summary judgment motion, presenting its summary judgment motion on its cross-claim, presenting its motion for default judgment, and paying Mandall to analyze Berry's YCA computer.

5. Denies Berry's Motion to Strike the testimony and expert report of Mandall.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Date: _May 6, 2004_